IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


BALOGH ASSOCIATES VII LLC,            )
                                      )
            Plaintiff,                )
                                      )
      v.                              )          1:20CV872
                                      )
DICK'S SPORTING GOODS, INC.,          )
                                      )
            Defendant.                )


## <u>MEMORANDUM OPINION AND ORDER</u>

**OSTEEN, JR., District Judge**

        Before this court is a Motion for Summary Judgment filed by
Plaintiff Balogh Associates VII LLC ("Balogh" or "Plaintiff"),
(Doc. 23). Also before this court is Defendant Dick's Sporting
Goods, Inc.'s motion for supplemental briefing, (Doc. 40), and
cross-motion for summary judgment, (Doc. 40-1).

        This court will deny Plaintiff's motion for summary
judgment on its breach of contract claim and Defendant's motion
for supplemental briefing. Defendant's cross-motion for summary
judgment will be granted in part and denied in part. This court
will grant the motion insofar as Defendant was permitted to pay
Substitute Rent for May 2020 and deny the motion as to all other
claims.

## I.   **FACTUAL BACKGROUND**

This court reviews the facts and draws all reasonable inferences in the light most favorable to nonmoving party when considering a motion for summary judgment. See Scott v. Harris, 550 U.S. 372, 378 (2007). The following facts are uncontested.

In 2005, Defendant, as tenant, signed a lease with JG Winston-Salem, LLC, as landlord ("Lease"). (Compl. (Doc. 3) ¶ 6; Lease (Doc. 23-1) at 4.)[1] On January 28, 2019, JG Winston-Salem assigned its rights in the Lease to Hanes Mall Parcels, LLC. (Compl. (Doc. 3) ¶ 8; Ex. B (Doc. 23-2) at 1.) On September 27, 2019, Hanes Mall Parcels assigned its rights in the Lease to Plaintiff. (Compl. (Doc. 3) ¶ 9; Ex. C (Doc. 23-3) at 1.)

Under the Lease, Defendant was required to pay "Minimum Rent" each month. (Lease (Doc. 23-1) § 4.1.) Minimum Rent was determined based on the year of the Lease and was payable "in advance, without notice or demand and without offset or abatement except as expressly set forth herein, upon the first day of each calendar month included within the term of [the] Lease." (Lease (Doc. 23-1) § 4.1(a)-(b).) In March, April, and May 2020, Minimum Rent was $90,750 a month. (See Compl. (Doc. 3)

---

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

-2-

¶ 11; <u>compare</u> Lease (Doc. 23-1) § 4.1(a)(ii), <u>with</u> Lease (Doc. 23-1) § 6.1).)

The Lease also provided that, in certain circumstances, Substitute Rent could be paid in lieu of Minimum Rent and defined Substitute Rent as "two percent (2%) of Gross Sales, but never more than the Minimum Rent for that month that would have otherwise been payable . . . ." (Lease (Doc. 23-1) § 1.5(c)(i).)

On March 19, 2020, Defendant sent Plaintiff a letter. (Ex. D ("March 19 Letter") (Doc. 23-4) at 1.) The letter stated that "[t]he COVID-19 (Coronavirus) Pandemic constitutes a force majeure event. As such, any store closures resulting from or in response to the COVID-19 (Coronavirus) Pandemic are permitted under the terms of the Lease." (<u>Id.</u>) Defendant sent Plaintiff another letter on March 27, 2020. (Ex. E ("March 27 Letter") (Doc. 23-5) at 1-2). This letter stated that Defendant had "temporarily closed all of [its] stores . . . effective March 19, 2020" because of the COVID-19 pandemic. (<u>Id.</u> at 1.) It also stated that

> [b]ased on the language of our lease, and our rights at law and in equity, we have determined that DSG has the right to abate all rent beginning as of the date of this closure, including, without limitation, minimum rent, percentage rent, substitute rent, co-tenancy rent, charges for taxes, common area costs and insurance (collectively, "<u>Rent</u>"). Legal rights aside, we recognize the significant and mutual financial pain caused by this unprecedented situation. In that light, DSG is prepared to offer the following:

-3-

- At locations where we closed in response to Governmental Mandates or Landlord Mandates, all Rent will abate from the date of this closure until the later of June 30, 2020, or the date that DSG re-opens for business; and

- At locations where our closure was not in response to Governmental Mandates or Landlord Mandates, all Rent that would otherwise have been due under the lease for the period from the date of this closure through June 30, 2020, shall be deferred and paid back, interest free, in equal monthly installments over a twelve-month period commencing January 1, 2021.

(Id. at 1–2.)

On April 3, 2020, Pauline Balogh, a co-owner of Plaintiff, (Ex. 1, Zoom Dep. of Pauline Balogh ("Def.'s Excerpts Balogh Dep.") (Doc. 25-1) at 8), emailed Brandon Barnett, a Director of Real Estate at Dick's, memorializing a phone call from earlier that morning, (Ex. 10 ("Email Chain") (Doc. 23-8) at 3–4). Balogh wrote that she was "willing to defer [Defendant's] base rent from $90750.00 each month to $80000.00 per month for March, April and June. The difference would be paid back starting Jan. 2021 . . . . If this proposal is not accepted, please e-mail me your counter proposal as soon as possible." (Id. at 4.) Barnett replied a few days later with a "revised proposal," (id. at 3), which Balogh declined, (id. at 2).

On April 9, 2020, Balogh and Barnett had a second call to discuss reducing April rent. (See Def.'s Excerpts Balogh Dep.

-4-

(Doc. 25-1) at 29.) Barnett confirmed the call's substance in an email, stating that "[p]er our conversation we will pay the April rent at a 25% reduction and pay back starting 1/1/2021. Please confirm and I will submit to my team." (Email Chain (Doc. 23-8) at 2.) Balogh replied "confirming that Dicks can reduce the April rent by 25 percent and defer the difference in full with [sic] Jan 1st 2021."[2] (Id. at 1-2.) Barnett responded that "[w]e will process on our end." (Id. at 1.)

Defendant paid Minimum Rent of $90,750 in March. (See Def.'s Answer to Compl. ("Answer") (Doc. 7) at 19.) Defendant did not pay any rent in April. (See Compl. (Doc. 3) ¶ 15; Answer (Doc. 7) at 14.) Defendant paid $13,712.85 in May rent. (Compl. (Doc. 3) ¶ 15; Answer (Doc. 7) at 14.)

## II. PROCEDURAL BACKGROUND

Plaintiff filed its Complaint in North Carolina state court alleging one claim for breach of contract. (See Compl.

---

[2] It is unclear whether Barnett or Balogh first emailed to memorialize the April 9, 2020, call. Balogh's email has a 9:49 a.m. timestamp; Barnett's has a 10:04 a.m. timestamp (Email Chain (Doc. 23-8) at 1-2.) This suggests Balogh's email was sent first. However, as noted by Plaintiff, "the threading, the text of the three emails and the time stamps on Barnett's emails suggest that [Balogh's] email was actually sent at 10:49 am, in response to. [sic] Barnett's 10:04 email with Barnett replying a minute later." (Pl.'s Reply Mem. of Law in Supp. of Mot. for Summ. J. ("Pl.'s Reply") (Doc. 27) at 3 n.1)(emphasis in original).) This court finds this issue does not constitute a material fact since the ordering of Balogh and Barrett's emails does not impact the substance of the parties' alleged agreement.

Case 1:20-cv-00872-WO-JLW   Document 46   Filed 09/30/22   Page 5 of 50

(Doc. 3).) Defendant removed to federal court. (<u>See</u> Doc. 1.)
Defendant also answered Plaintiff's Complaint and alleged six
counterclaims against Plaintiff. (Answer (Doc. 7) at 19-23.)

   After discovery concluded, Plaintiff filed a motion for
summary judgment, (Doc. 23), and a brief in support, (Pl.'s Mem.
of Law in Supp. of Mot. for Summ. J. ("Pl.'s Br.") (Doc. 24)).
Defendant responded, (Def.'s Resp. to Mot. for Summ. J. ("Def.'s
Resp.") (Doc. 25)), and Plaintiff replied, (Pl.'s Reply
(Doc. 27). More than five months after the end of briefing,
Defendant filed a motion to (1) accept its response to
Plaintiff's motion for summary judgment as a cross-motion for
summary judgment and (2) for leave to file a supplemental
submission, (Doc. 40), as well as a brief in support, (Def.'s
Mem. of Law in Supp. of Mot. ("Def.'s Mem.") (Doc. 41)).
Plaintiff filed a response in opposition. (Pl.'s Resp. to Def.'s
Mot. to File Mot. for Summ. J. ("Pl.'s Resp. to Def.'s Mot.")
(Doc. 42.) This court granted Defendant's motion to accept its
response as a cross-motion for summary judgment and reserved
judgment on the remainder of the motion. (Order (Doc. 45) at 4-
5.)

   This court now addresses Plaintiff's motion for summary
judgment, (Doc. 23), Defendant's motion for supplemental

briefing, (Doc. 40), and Defendant's cross-motion for summary judgment, (Doc 40-1).

III. **STANDARD OF REVIEW**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). This court's summary judgment inquiry is whether the evidence "is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). The moving party bears the initial burden of demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. If "the moving party discharges its burden . . ., the nonmoving party then must come forward with specific facts showing that there is a genuine issue for trial." McLean v. Patten Cmtys., Inc., 332 F.3d 714, 718–19 (4th Cir. 2003).

A factual dispute is genuine and triable when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; see also First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289–90 (1968) (recognizing that a dispute is not genuine for summary judgment purposes when one party rests solely on allegations in

-7-

the pleadings and does not produce any evidence to refute
alternative arguments). This court must look to substantive law
to determine which facts are material because only those "facts
that might affect the outcome of the suit under the governing
law will properly preclude the entry of summary judgment."
Anderson, 477 U.S. at 248.

In addition, "the mere existence of some alleged factual
dispute between the parties will not defeat an otherwise
properly supported motion for summary judgment." Id. at 247–48
(emphasis in original). "[T]he non-moving party must do more
than present a 'scintilla' of evidence in its favor." Sylvia
Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir.
1995) (quoting Anderson, 477 U.S. at 252). "What Rule 56(e) does
make clear is that a party cannot rest on the allegations
contained in his complaint in opposition to a properly supported
summary judgment motion made against him." First Nat'l Bank of
Ariz., 391 U.S. at 289. Summary judgment should "be granted
unless a reasonable jury could return a verdict for the
nonmovant on the evidence presented." McLean, 332 F.3d at 719.

When facing cross-motions for summary judgment, this court
reviews "each motion separately on its own merits to determine
whether either of the parties deserves judgment as a matter of
law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003)

(citations and internal quotation marks omitted). "When considering each individual motion, the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." Id. (citation and internal quotation marks omitted).

IV. **ANALYSIS**

Plaintiff seeks summary judgment on its breach of contract claim. (Compl. (Doc. 3) ¶ 20; see also Pl.'s Br. (Doc. 24) at 5-9.) Defendant raises several affirmative defenses in response: (1) that Plaintiff's claim is barred by the nonoccurrence of conditions precedent; (2) that rent was equitably abated under Sections 3.6 and 17.16 of the Lease; (3) that Plaintiff breached its own obligations under the Lease and; (4) that Defendant's obligation to pay rent was excused pursuant to the doctrines of frustration of purpose and impossibility. (Answer (Doc. 7) at 5-6.) Defendant also asserts six counterclaims that overlap with its affirmative defenses: (1) declaratory judgment that the Co-Tenancy Requirement was not met as of late March 2020, that Defendant was entitled to pay Substitute Rent in lieu of Minimum Rent while the Co-Tenancy Requirement was not satisfied, and that the Force Majeure clause does not affect Defendant's rights with regard to the Co-Tenancy Requirement; (2) declaratory

-9-

judgment that rent was equitably abated while Defendant was closed from March 19, 2020 through May 8, 2020, pursuant to Sections 3.6 and 17.16 of the Lease, and that Defendant is entitled to a partial rebate for rent paid for March; (3) frustration of purpose; (4) breach of contract; (5) return of money had and received; and (6) attorneys' fees. (Id. at 19–23.)

Defendant's Cross-Motion seeks summary judgment on four issues: (1) for Declaratory Judgment that (a) the Co-Tenancy Requirement of the Lease was violated, such that Defendant was entitled to pay Substitute Rent, (b) the Force Majeure provisions of Section 17.3 do not impact Defendant's rights under the Co-Tenancy Requirement, and (c) Defendant is not in default under the Lease; (2) for Declaratory Judgment that Defendant was entitled to abate its rent under Sections 3.6 and 17.16 of the Lease; (3) that Defendant's purpose in entering the Lease was frustrated by the COVID-19 Pandemic; and (4) on a counterclaim for breach of contract. (Def.'s Cross-Mot. for Summ. J. (Doc. 41-1) at 1.)

This memorandum addresses only the issues raised by the parties that are necessary for this court to rule on Plaintiff's motion for summary judgment and Defendant's cross-motion for summary judgment. This memorandum will first consider Defendant's request for supplemental briefing. This court will

-10-

then consider Plaintiff's breach of contract claim. Ruling on Plaintiff's claim requires considering whether Defendant was permitted to abate its rent under Section 3.6 or 17.16, whether the Co-Tenancy Requirement was violated, whether the parties entered into a rent deferral agreement for April 2020 rent, and whether the purpose of the Lease was frustrated. Finally, this court will consider Defendant's cross-motion for summary judgment for breach of contract.

## A. **Defendant's Request for Supplemental Briefing**

Defendant seeks leave to file a supplemental submission in opposition to grounds Plaintiff allegedly raised for the first time in its reply. (Doc. 40.) Defendant argues that it lacked notice that Plaintiff "was moving for summary judgment regarding breach of an alleged settlement agreement." (Def.'s Mem. (Doc. 41) at 5.) Plaintiff counters that Defendant "first raised the [settlement] [a]greement" issue, (Pl.'s Resp. to Def.'s Mot. (Doc. 42) at 9), so, Plaintiff was entitled to respond to those arguments in its reply, (see id.).

In this district, Local Rule 7.3(h) governs reply briefs and states that they are "limited to discussion of matters newly raised in the response." Local Rule 7.3(h). "Courts in this district interpreting Local Rule 7.3(h) have consistently held that '[r]eply briefs . . . may not inject new grounds' for

argument." <u>Pouncey v. Guilford Cnty.</u>, No. 1:18CV1022, 2020 WL 1274264, at *5 (M.D.N.C. Mar. 17, 2020) (alteration in original) (cleaned up) (quoting <u>Triad Int'l Maint. Corp. v. Aim Aviation, Inc.</u>, 473 F. Supp. 2d 666, 670 n.1 (M.D.N.C. 2006)). "In sum, Local Rule 7.3(h) exists to give the replying party a chance to rebut newly raised arguments, not to give the replying party an unfair advantage in having a chance to make new arguments that should have been raised initially." <u>Id.</u> (citations omitted).

The parties dispute whether Plaintiff's reply brief "injected new grounds" for argument. (<u>Compare</u> Def.'s Mem. (Doc. 41) at 5–6, <u>with</u> Pl's Resp. to Def.'s Mot. (Doc. 42) at 9–10.) Plaintiff first raised the issue of the rent deferral agreement in its brief where it states that Balogh

> [N]egotiated a rental abatement agreement with Brandon Barnett . . . . The parties' agreed that that [sic] 25% of Dick's April, 2020 rent would be deferred and repaid on January 1, 2021. Dick's, however, reneged upon this agreement, paid no rent for April, 2020 and unilaterally paid only $13,712.85, in arrears, for May, 2020.

(Pl.'s Br. (Doc. 24) at 3.) Defendant's response included a section responding to this allegation titled: "The Parties Did Not Reach Any Settlement Agreement, Let Alone One that [Defendant] Breached." (Def.'s Resp. (Doc. 25) at 18–19.) Plaintiff's reply went on to highlight evidence establishing the parties reached an enforceable contract, that Barnett accepted

-12-

the agreement, and that Barnett had authority to do accept. <u>See</u> <u>infra</u> Section IV.B.4.

Thus, Plaintiff did not "inject new grounds," <u>Pouncey</u>, 2020 WL 1274264, at *5, by arguing in its reply that the parties executed a rent deferral agreement. (<u>See</u> Pl.'s Reply (Doc. 27) at 1–5.) Instead, Plaintiff's reply responded to Defendant's argument that no settlement agreement was reached, (<u>See</u> Def.'s Resp. (Doc. 25) at 18–19), by presenting further facts and evidence about the existence of the agreement, (<u>See</u> Pl.'s Reply (Doc. 27) at 1–6). Since Plaintiff's reply did not inject new grounds for argument, <u>see</u> <u>Pouncy</u>, 2020 WL 1274264, at *5, Defendant is not entitled to file a response pursuant to Local Rule 1.7(h).

Defendant points to two cases in support of its argument for supplemental briefing. (Def.'s Mem. (Doc. 41) at 6.) However, those cases arise in the context of a district court granting summary judgment <u>sua sponte</u>. See <u>Moore v. Equitrans,</u> <u>L.P.</u>, 27 F.4th 211, 224 (4th Cir. 2022) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments <u>sua sponte</u>, so long as the losing party was on notice that she had to come forward with all of her evidence.") (emphasis in original); <u>see also</u> <u>U.S. Dev. Corp. v. Peoples Fed.</u> <u>Sav. & Loan Ass'n</u>, 873 F.2d 731, 735 (4th Cir. 1989) ("The

district court entered summary judgment against appellant[] . . . . <u>sua sponte</u>. . . . [T]hat power is contingent on giving the losing party notice that it must come forward and defend its claim.") (emphasis in original). Here, this court is not deciding on summary judgment sua sponte. Instead, this court is acting with the benefit of motions and briefing supplied by the parties. Furthermore, Defendant was on notice about Plaintiff's position regarding the agreement because Plaintiff included that argument in their brief. (<u>See</u> Pl.'s Br. (Doc. 24) at 3.)

Therefore, this court will deny Defendant's motion for leave to file a supplemental submission. (Doc. 41).

B.  **<u>Plaintiff's Breach of Contract Claim</u>**[3]

Under North Carolina law, "[a] lease is a contract which contains both property rights and contractual rights." <u>Strader v. Sunstates Corp.</u>, 129 N.C. App. 562, 570, 500 S.E.2d 752, 756 (1998). "Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." <u>State v. Philip Morris USA Inc.</u>, 359 N.C. 763, 773, 618 S.E.2d 219, 225 (2005).

---

[3] Plaintiff argues this court "should apply North Carolina law to the interpretation of the Lease provisions." (Pl.'s Br. (Doc. 24) at 4-5.) Defendant does not respond to this argument but relies on North Carolina law in its response memorandum. (<u>See</u> Def.'s Resp. (Doc. 25).) Therefore, this court will apply North Carolina law in determining whether summary judgment should be granted.

-14-

"It must be presumed the parties intended what the language used clearly expresses, and the contract must be construed to mean what on its face it purports to mean." <u>Hartford Accident & Indem. Co. v. Hood</u>, 226 N.C. 706, 710, 40 S.E.2d 198, 201 (1946) (internal citation omitted). "When the language of a contract is plain and unambiguous then construction of the agreement is a matter of law for the court." <u>Whirlpool Corp. v. Dailey Constr., Inc.</u>, 110 N.C. App. 468, 471, 429 S.E.2d 748, 751 (1993).

If, however, the language of a contract "is ambiguous and the intention of the parties is unclear, interpretation of the contract is for the [finder of fact]," and summary judgment is not appropriate. <u>Glover v. First Union Nat'l. Bank of N.C.</u>, 109 N.C. App. 451, 456, 428 S.E.2d 206, 209 (1993). A contract is ambiguous "when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations." <u>Register v. White</u>, 358 N.C. 691, 695, 599 S.E.2d 549, 553 (2004). In determining whether a contract is ambiguous, "words are to be given their usual and ordinary meaning and all the terms of the agreement are to be reconciled if possible." <u>Piedmont Bank and Tr. Co. v. Stevenson</u>, 79 N.C. App. 236, 241, 339 S.E.2d 49, 52 (1986). Here, both parties

assert the language of the Lease is unambiguous.[4] (Compare Pl.'s Br. (Doc. 24) at 3, with Def.'s Resp. (Doc. 25) at 1.)

The elements of a North Carolina breach of contract claim are "(1) existence of a valid contract and (2) breach of the terms of that contract." Poor v. Hill, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). The parties do not dispute a valid contract existed; rather, both argue the other has breached the Lease. (See Pl.'s Br. (Doc. 24) at 6; see also Def.'s Resp. (Doc. 25) at 9–19.)

### 1. Abatement under Section 3.6

Section 3.6 is titled "Landlord's Construction Representations." (Lease (Doc. 23-1) § 3.6.) It contains several warranties made by Plaintiff. (Id.) Defendant argues subsection (b) provides authority for equitable abatement. (See Def.'s Resp. (Doc. 25) at 13–15.) That subsection states

> [I]f, at any time, any governmental or quasi-governmental entity or insurance rating bureaus having jurisdiction shall determine that Landlord's portion of the Shopping Center, including Landlord's Work, shall not have been performed or constructed or Landlord's operation of the Shopping Center is not in compliance with any applicable law, code, ordinance or regulation or insurance rating standard and shall request compliance with the same or if Landlord's failure to comply shall in any way adversely affect

---

[4] As explained hereafter, this court finds the relevant provisions are ambiguous. That conclusion is confined to some degree by the parties' respective positions. While they both contend the provisions are unambiguous, they reasonably argue that the provisions have different meanings and effect.

the use of the Demised Premises, the Tenant Service
Area, the Service Drive or the Protected Parking Areas
by Tenant or adversely affect any other rights of
Tenant under this Lease or impose any obligation upon
Tenant not contained in this Lease, then Landlord
shall, upon receipt of notice of such complaint, or
determination of non-compliance, promptly, at its sole
cost and expense, cause such repairs, alterations or
other work to be done or action to be taken so as to
bring about the compliance requested and/or otherwise
eliminate the adverse effect upon the Tenant. If by
reason of such failure of compliance or by reason of
such repairs, alterations or other work done by
Landlord, Tenant shall be deprived of the use or
enjoyment of the whole or any part of the Demised
Premises, the Tenant Service Area, the Protected
Parking Areas or the interior Common Areas, all Rent
or Substitute Rent shall abate on a per diem basis in
proportion to such deprivation. Further, if at any
time the applicable zoning and other applicable laws
shall not permit the retail sale of any and all types
of wearing apparel, sporting goods or hunting
equipment in the Demised Premises, then, in addition
to the aforesaid Rent abatement, Tenant, without
waiving any other rights that Tenant may have on
account thereof, may terminate this Lease, by giving
Landlord notice thereof, provided, however, that
Landlord shall have thirty (30) days within which to
cure such non-compliance with zoning and/or other
applicable laws prior to Tenant's exercising such
right to terminate. Notwithstanding the foregoing, the
rights of Tenant under the preceding sentence shall be
inapplicable if it shall hereafter become unlawful to
sell firearms and/or ammunition from the Demised
Premises.

(Lease (Doc. 23-1) § 3.6(b)(emphasis added).)

Defendant argues that its obligation to pay rent was

equitably abated under Section 3.6(b) of the Lease. (Def.'s

Resp. (Doc. 25) at 13–15.) Defendant argues that the "and other

applicable laws" language applies to the North Carolina

-17-

governor's executive orders regarding COVID-19 and that those orders prohibited the sale of items in Defendant's store. (Id.) Plaintiff argues that Defendant's rent was not abated under Section 3.6 because the parties intended to limit the scope of that section "to situations where construction defects, and laws and ordinances pertaining to land use and construction . . . deprived [Defendant] of the ability to use of the premises." (Pl.'s Br. (Doc. 24) at 12.)[5]

North Carolina's rules of contract interpretation require an agreement to be construed as a whole and to determine the intent of the parties "from the entire instrument and not from detached portions. Individual clauses are to be considered in context. All parts of the contract will be given effect if possible." Int'l Paper Co. v. Corporex Constructors, Inc., 96 N.C. App. 312, 316, 385 S.E.2d 553, 555–56 (1989) (internal citation omitted). A contract is ambiguous if "the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations." Register, 358 N.C. at 695, 599 S.E.2d at 553. When a court is asked to interpret an

---

[5] Plaintiff occasionally cites Section 3.7 as the section of the Lease at issue. (See Pl.'s Br. (Doc. 24) at 12.) This court will assume that Plaintiff intended to cite Section 3.6 since that is the section relied upon by Defendant. (See Def.'s Resp. (Doc. 25) at 13.)

ambiguous contract, summary judgment is not appropriate. <u>Glover</u>, 109 N.C. App. at 456, 428 S.E.2d at 209.

Under Defendant's interpretation of Section 3.6, "other applicable laws" includes the governor's executive orders because they prohibited the sale of retail items offered by Defendant in the Demised Premises. (<u>See</u> Def.'s Resp. (Doc. 25) at 14.) This court finds it is reasonable to interpret "other applicable laws" as stated in Section 3.6 of the Lease to include executive orders issued by the governor that affect "the retail sale of any and all types of wearing apparel, sporting goods or hunting equipment." (Lease (Doc. 23-1) § 3.6(b).) It is reasonable to interpret "applicable" to mean applicable to the Demised Premises. Executive orders, such as those issued by the governor in response to COVID-19, that affect whether Defendant can operate its retail business are "applicable" to Defendant.

Likewise, it is reasonable to interpret "other applicable laws" to mean "situations where construction defects, and laws and ordinances pertaining to land use and construction . . . deprive[] Dick's of the ability to use of [sic] the premises" as argued by Plaintiff. (Pl.'s Br. (Doc. 24) at 12.) Article III of the Lease is titled "Construction," so it is reasonable to interpret "applicable" to limit the types of laws to those related to construction.

-19-

Plaintiff argues Defendant's interpretation renders the Force Majeure provision in Section 17.3 of the Lease meaningless. (See id.) This court disagrees. Section 17.3 of the Lease defines a Force Majeure Event to

> mean any act or event that wholly or partially prevents the affected Party from performing any of its obligations (other than the payment of money) if such act or event is beyond the reasonable control of and does not arise out of the negligent act or omission of, the affected Party . . . .

(Lease (Doc. 23-1) § 17.3 (emphasis added).)

Section 17.3 concerns force majeure events that affect a party's ability to perform their contractual obligations "other than the payment of money." (Id.) As Defendant notes, this provision could be read to prevent a party from relying "on the Force Majeure provisions themselves to excuse payments under the Lease. For example, if there was a flood at [Defendant's] corporate headquarters or bank that prevented [Defendant] from making payments, it could not rely on Section 17.3, which does not excuse the 'payment of money.'" (Def.'s Resp. (Doc. 25) at 11.) Therefore, Defendant's interpretation does not render Section 17.3 meaningless.

Where the words or effect of a contract are uncertain or capable of multiple reasonable interpretations, summary judgment is inappropriate. Glover, 109 N.C. App. at 456, 428 S.E.2d at 209. Here, because both Plaintiff's and Defendant's

-20-

interpretations are reasonable, the contract is "capable of multiple reasonable interpretations." Id. Therefore, this court finds Section 3.6 is ambiguous on the question of whether Defendant's obligation to pay rent is equitably abated when a law unrelated to construction or land use deprives the tenant of use of the Demised Premises. Since the language of Section 3.6 is ambiguous, this court will deny both parties' motions for summary judgment insofar as they concern Defendant's ability to abate rent under Section 3.6.

### 2. Abatement under Section 17.16

Defendant further argues that its obligation to pay rent was equitably abated under Section 17.16 of the Lease.[6] (Def.'s Resp. (Doc. 25) at 15–18.) Subsection 17.16 is titled "Representations and Warranties," and the relevant portion states

> If at any time there is a breach or default of any of Landlord's representations, warranties or agreements under this Section 17.16 which results in deprivation or impairment in any material respect in the use and enjoyment of the Demised Premises, or if for any other reason Tenant shall be deprived of or impaired in the use and enjoyment of the Demised

---

[6] Defendant occasionally cites Section 17.6 as the section of the Lease Defendant contends provides authority for equitable abatement. (See Def.'s Answer (Doc. 7) at 8, 11, 20; see also Def.'s Resp. (Doc. 25) at 8). This court will assume Defendant intended to cite Section 17.16 since that is the section of the Lease Defendant quotes in its argument. (See, e.g., Def.'s Answer (Doc. 7) at 7, 11, 17; see also Def.'s Resp. (Doc. 25) at 8.)

-21-

> Premises and Common Areas as herein provided, the Rent to be paid by Tenant shall be equitably abated during any such period. If such period continues for more than thirty (30) days after notice from Tenant and such additional period as is reasonably necessary to cure same so long as Landlord is pursuing with due diligence, but not longer than one hundred eighty (180) days, Tenant may, at its option, cancel this Lease by notice to Landlord while reserving all rights which Tenant may have for Landlord's breach of this Lease.

(Lease (Doc. 23-1) § 17.16(a) (emphasis added).)

Plaintiff asks this court to read the language "any reason" as limited to reasons related to the representations and warranties provided in Section 17.16. (See Pl.'s Br. (Doc. 24) at 12-14.) Under this interpretation, because Section 17.16 arguably made no representations or warranties regarding closures from an unanticipated public health emergency,[7] (see

_____

[7] It is arguable, but not obvious, that Section 17.16 makes no representations about public health emergencies. Section 17.16(a)(ii) says

> Tenant's use of the Common Areas of the Shopping Center for access to the Demised Premises, accessory automobile parking, signage (subject to Section 8.4) and service facilities contemplated by this Lease shall not be prevented or materially impaired by any current. . . health [or] safety, . . . governmental law or regulation . . . ."

(Lease (Doc. 23-1) § 17.16(a)(ii).) This court reads this section of the contract to only provide representations concerning "current" laws, meaning laws that applied when the contract was entered into in 2005, (Pl.'s Br. (Doc. 24) at 2; Def.'s Resp. (Doc. 25) at 4). Thus, it would not apply to laws arising from the COVID-19 pandemic. Therefore, it does not appear to impact the analysis that Section 17.16 made no representations concerning a public health emergency declared in 2020.

-22-

Lease (Doc. 23-1) § 17.16), closing due to COVID-19 was not a reason that would permit Defendant to equitably abate its rent.

Under Defendant's interpretation of Section 17.16, if the Tenant is deprived of the use and enjoyment of the Demised Premises for "any reason," its rent obligations are equitably abated. (Def.'s Answer (Doc. 7) at 11 (emphasis in original).) Defendant argues that when the Demised Premises was closed due to COVID-19 Defendant "was both deprived of and impaired in the use and enjoyment of the Demised Premises because it was wholly unable to use the Demised Premises as a retail sporting goods store." (Def.'s Resp. (Doc. 25) at 16.) Defendant claims that since its use of the Demised Premises was impaired by the COVID-19 closure, this qualifies as a "reason" under Section 17.16 that allows it to equitably abate its rent payments. (See id.)

Defendant responds to Plaintiff's argument that the phrase "any reason" should be limited by the context of representations and warranties by noting that parties make representations and warranties in contracts "to allocate risks between the parties." (Id. at 17 n.4.) Defendant argues its interpretation is consistent with the parties' intent in the Lease "to provide [Defendant] a space to operate its retail store." (Id.) To further this purpose, the "Landlord represents and warrants that" if the Tenant's "use and enjoyment of the Demised Premises

-23-

is impaired, for any reason, its Rent obligations shall be equitably abated." (Id.)

Defendant also notes that Plaintiff's reading would effectively require this court to substitute the word "reason" for the phrase "violation of the [re]presentations and warranties." (Id. at 16 (emphasis and internal quotation marks omitted).) Therefore, its interpretation is at odds with the Lease's plain language. (See id. at 16–17.)

This court finds it reasonable to interpret "any reason" to mean just that—any reason that impairs Tenant's use and enjoyment of the premises. Moreover, it is reasonable to find that the closure impaired Defendant's use of the Demised Premises because it prevented Defendant from making in-person retail sales. (See id. at 16.)

Furthermore, Plaintiff's interpretation, which effectively interprets "any reason" to mean any reason related to the aforementioned representations and warranties, (Pl.'s Br. (Doc. 24) at 12–13), is also reasonable. Section 17.16 is titled "Representations and Warranties," (Lease (Doc. 23–1) § 17.16), so it is reasonable to interpret "any reason" as constrained to reasons arising out of the representations and warranties the parties set out elsewhere in Section 17.16.

-24-

Plaintiff argues that Defendant's interpretation would render several sections of the Lease superfluous including the Force Majeure provision, the Representations and Warranties section, the Co-Tenancy provision, the section on partial abatement if the premises are damaged or destroyed, and the provision allowing for partial abatement if the premises are partially condemned. (See Pl.'s Reply (Doc. 27) at 10.) This court finds that while these arguments may strengthen Plaintiff's interpretation, they do not demonstrate that Defendant's interpretation is unreasonable.

When a contract's language "is fairly and reasonably susceptible to either" party's interpretation, it is ambiguous. Glover, 109 N.C. App. at 456, 428 S.E.2d at 209. Interpretation of an ambiguous contract is an issue for the jury. Id. Here, because the parties have each advanced contrary, reasonable interpretations of the abatement language in Section 17.16, summary judgment on this issue is inappropriate.

### 3. <u>Co-Tenancy Requirement</u>

Defendant argues that the Co-Tenancy Requirement is a condition precedent to its obligation under the Lease to pay Minimum Rent. (See Def.'s Resp. (Doc. 25) at 9-10.) "A condition precedent is an event which must occur before a contractual right arises, such as the right to immediate performance. Breach

-25-

or non-occurrence of a condition prevents the promisee from acquiring a right, or deprives him of one, but subjects him to no liability." Handy Sanitary Dist. v. Badin Shores Resort Owners Ass'n, 225 N.C. App. 296, 301-02, 737 S.E.2d 795, 800 (2013) (quoting In re Foreclosure of Goforth Props., Inc., 334 N.C. 369, 375, 432 S.E.2d 855, 859 (1993)).

Plaintiff does not directly address whether the Co-Tenancy Requirement is a condition precedent to Defendant's obligation to pay Minimum Rent. (See Pl.'s Reply (Doc. 27) at 7-9.) Nevertheless, this court finds the language of the Co-Tenancy Requirement to be a condition precedent to Defendant's obligation to pay Minimum Rent. Specifically, Section 1.7(b) states that if "the Co-Tenancy Requirement is not satisfied . . . Tenant shall then pay to Landlord monthly, in lieu of Minimum Rent, . . . Substitute Rent . . . ." (Lease (Doc. 23-1) § 1.7(b).) This language indicates that the Co-Tenancy Requirement must be met for Defendant to become obligated to pay Minimum Rent—if the requirement is not satisfied, Defendant does not have to pay Minimum Rent.

Having determined that the Co-Tenancy Requirement is a condition precedent to Defendant's obligation to pay Minimum Rent, this court will turn to the question of whether the Co-Tenancy Requirement was satisfied. Defendant argues that the Co-

Tenancy Requirement was not met, so it was entitled to pay
Substitute Rent from April 2020 through June 2020. (See Def.'s
Resp. (Doc. 25) at 9–13.) Plaintiff argues that the Co-Tenancy
Requirement was not violated because that provision does not
apply to force majeure events. (See Pl.'s Br. (Doc. 24) at 14–
16.)

Section 1.7 of the Lease contains a Co-Tenancy Requirement,
which says

> (a) As used in this Section 1.7, the term "Co-
> Tenancy Requirement" shall mean (i) that at least
> three (3) Department Stores shall be open and
> operating (i.e., conducting business operations in at
> least eighty-five percent (85%) of the [Leasable Floor
> Area or "LFA"] available for such stores); and (ii)
> that at least sixty-five percent (65%) of the LFA of
> the Shopping Center, excluding the Demised Premises,
> the Department Stores and any outparcels, shall be
> open for the operation of a retail business by one or
> more Required Tenant(s). A Department Store shall not
> be deemed to have ceased operations until such
> Department Store is not open for a period in excess of
> one hundred eighty (180) consecutive days. A
> Department Store shall not be deemed to have ceased
> operations if such Department Store is not open for
> reasons of casualty, a Force Majeure Event, repairs,
> remodeling or renovation. A "Required Tenant" shall
> mean a single national, regional or local Occupant of
> the type typically found in first (1st) class regional
> shopping centers.

(Lease (Doc. 23-1) § 1.7(a) (emphasis omitted).) Defendant does
not argue that the first requirement was not met; rather,
Defendant argues that "prong (ii) was not satisfied." (Def.'s
Resp. (Doc. 25) at 10.)

-27-

The second prong of the Co-Tenancy Requirement requires that "at least sixty-five percent (65%) of the LFA of the Shopping Center, excluding the Demised Premises, the Department Stores and any outparcels, shall be open for the operation of a retail business by one or more Required Tenant(s)." (Lease (Doc. 23-1) § 1.7(a).) Leasable Floor Area, or LFA, is defined as

> the number of gross square feet of leasable floor area (whether occupied or unoccupied) of the Shopping Center Buildings intended for the exclusive use by any tenant, subtenant, assignee, licensee, concessionaire or other occupant of the Shopping Center ("Occupant") thereof including mezzanines or other levels if used for retail sales or if leased for offices not related to the retail use thereon. The LFA of any premises shall be measured from the exterior face of exterior walls and the exterior face of service corridor walls, the line along the front of such premises where it abuts the sidewalk: or other Common Areas, and the center line of any wall that such premises shares with an adjoining premises. Notwithstanding the foregoing, the Demised Premises shall be deemed to contain 66,000 square feet of LFA.

(Id. § 1.2(d)(emphasis omitted).)

Pauline Balogh, one of Plaintiff's owners, acknowledged that none the Shopping Center was open from the end of March to the beginning of May (when the Shopping Center was allowed to reopen). (Def.'s Excerpts Balogh Dep. (Doc. 25-1) at 8, 24.) Although the form of the question asked to Balogh was vague, (see id. at 24), Plaintiff does not dispute that Hanes Mall was completely closed from the end of March to the beginning of May

-28-

2020 due to the North Carolina governor's executive order, (see Ex. 3 Executive Order No. 121 ("March Order") (Doc. 25-3); Ex. 4 Executive Order No. 138 ("May Order") (Doc. 25-4); see also Zoom Dep. of Pauline Balogh ("Pl.'s Excerpts Balogh Dep.") (Doc. 23-6) at 22 (discussing the March shutdown notice from the governor)).

Thus, Plaintiff's own evidence indicates there is no dispute that at least sixty-five percent of the LFA of the Shopping Center, excluding the Demised Premises, the Department Stores, and any outparcels, was not open for the operation of retail business while the governor's executive order was in effect. Therefore, there is no genuine dispute of material fact that the second prong of the Co-Tenancy Requirement was not met from March 30, 2020, when the order went into effect, (see March Order (Doc. 25-3)), until May 8, 2020, when the shutdown ended, (see May Order (Doc. 25-4)).

Plaintiff's argument that a force majeure event precludes a finding that the Co-Tenancy Requirement was not met has merit as to prong one. Assuming, without deciding, that the COVID-19 pandemic qualifies as a force majeure event, the plain language of the Lease indicates that Department Stores have not ceased operations when they are closed due to a force majeure event. (Lease (Doc. 23-1) § 1.7(a).) But Section 1.7(a) does not

contain similar language with respect to closure of the Shopping
Center LFA, which is the subject of the second prong. (See id.)
Because the modifying language applies to Department Stores and
not the Shopping Center, closures of the Shopping Center's LFA
from force majeure-type events (where sixty-five percent or more
of the LFA is not open) violate the Co-Tenancy Requirement.
Therefore, this court finds a force majeure event does not
modify the language of the second prong of the Co-Tenancy
Requirement.[8]

Plaintiff argues this interpretation would render Section
17.3 of the Lease, the Force Majeure provision, superfluous
because the Force Majeure provision "exclude[s] payment of money
from the obligations that could be suspended by a force majeure
event. (See Pl.'s Br. (Doc. 24) at 16.) However, when a force
majeure event triggers a violation of the Co-Tenancy Requirement
and results in Defendant paying Substitute Rent, Section 17.3 is
not meaningless, (see Lease § 1.7(b)), because the payment of
rent generally is not excused. (See id.) Instead, only the

---

[8] Plaintiff argues that "a Co-Tenancy violation occurs if
(i) the mall has fewer than three Department Stores or if less
than 65% of the leasable floor area ('LFA') of the mall not
occupied by Dick's or a Department Store is not filled by
Required Tenants." (Pl.'s Reply (Doc. 27) at 8 (emphasis in
original).) This interpretation of the Co-Tenancy Requirement is
squarely at odds with the plain language of the Co-Tenancy
Requirement, which requires both prong one and prong two to be
satisfied. (See Lease (Doc. 23-1) § 1.7.)

payment of <u>Minimum Rent</u> is excused, and the Tenant is obligated to pay Substitute Rent in lieu of Minimum Rent. (<u>See</u> <u>id.</u>)

If the co-tenancy requirement is violated, the Lease provides that the Tenant pays, "in lieu of Minimum Rent, . . . Substitute Rent." (Lease (Doc. 23-1) § 1.7(b).) Substitute Rent is defined as "two percent (2%) of Gross Sales, but never more than the Minimum Rent for that month that would have otherwise been payable for such calendar month." (<u>Id.</u> § 1.5(c)(i).) Gross Sales means

> the total amount of all sales of merchandise and services made, sold or rendered in, upon or from the Demised Premises during such lease year or partial lease year in each case whether the same shall be made by Tenant or by any subtenant, licensee or concessionaire of Tenant, whether for cash or on a charge or credit basis, whether delivered from the Demised Premises or elsewhere. . . .

(<u>Id.</u> § 6.2.) Gross Sales must occur "upon or from the Demised Premises" and do not include "[i]nternet or catalog sales." (<u>Id.</u>)

Because the Co-Tenancy Requirement was violated, Defendant was entitled to pay Substitute Rent in lieu of Minimum Rent. The remaining question is for how long the Co-Tenancy Requirement was violated, and relatedly, how long Defendant was entitled to pay Substitute Rent. Section 1.7(b) of the Lease states that in the event of a Co-Tenancy violation, the Tenant shall pay "Substitute Rent, during the period which extends from the

-31-

beginning of the first full calendar month following the Co-Tenancy Violation and continuing until the end of the calendar month in which such Co-Tenancy Requirement is satisfied." (Id. §1.7(b).) Since the governor's executive order went into effect in March, Defendant was entitled to pay Substitute Rent beginning in April 2020. That entitlement would expire at the end of the month in which the Co-Tenancy Requirement was again satisfied.

Plaintiff does not dispute that Hanes Mall was completely closed from March 30, 2020 until May 8, 2020. (See March Order (Doc. 25-3); see also May Order (Doc. 25-4); see also Pl.'s Excerpts Balogh Dep. (Doc. 23-6) at 22 (discussing the March shutdown notice from the governor).) Therefore, under the terms of the Lease, Defendant was entitled to pay Substitute Rent for April and May 2020.[9]

Defendant argues the Co-Tenancy Requirement remained unmet for some period after the conclusion of the shutdown. (See Decl. of Kristen Boscarino ("Boscarino Decl.") (Doc. 26) ¶ 6).

_____

[9] This does not foreclose the possibility that a subsequent agreement, for example the alleged rent deferral agreement, could have supplanted Defendant's ability to pay rent for some of these months. Furthermore, the parties have not addressed how the closure for two days in March and eight days in May might affect the damages calculation. Because issues remain for trial regardless, the court does not resolve the March and May issues here.

-32-

Presumably, this is why Defendant seeks a declaratory judgment that the Co-Tenancy Requirement was not met "between, at least, March 2020 and June 2020." (Def.'s Cross-Mot. for Summ. J. (Doc. 41-1) at 1.) To prove this allegation, Defendant asks this court to rely on Kristen Boscarino's Affidavit, which claims the Co-Tenancy Requirement was not met even after the Shopping Center reopened on May 8, 2020. (Boscarino Decl. (Doc. 26) ¶ 6). This court declines to do so.

An affidavit which is "conclusory, . . . does not set forth facts of which the [affiant] has personal knowledge[,] and . . . does not give specific facts, but only generalities" does "not measure up to the requirements of Rule 56(e)." Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984).

Though Boscarino states she has "personal knowledge of the facts and matters herein," (Boscarino Decl. (Doc. 26) ¶ 1), the allegation "that the Co-Tenancy Requirement . . . remained unsatisfied after the Shopping Center reopened," (Id. ¶ 6), is unsupported by reference to any evidence. Defendant does not provide its calculations for determining that the requisite number of tenants were closed, identify which stores remained closed after the shutdown ended, or provide dates for when they reopened. Since the relevant language of the affidavit is "conclusory" and lacks "specific facts," Barwick, 736 F.2d at

-33-

960, this court declines to rely on it to prove the Co-Tenancy Requirement remained unmet after May 8, 2020.

Similarly, defendant argues that "[Plaintiff] does not . . . dispute that from March 2020 through June 2020," the Co-Tenancy Requirement was not met. (Def. Resp. (Doc. 25) at 7.) However, more accurately, Balogh stated that Plaintiff did not perform any calculations to determine whether the Co-Tenancy requirement was met between March and June 2020. (Def.'s Excerpts Balogh Dep. (Doc. 25-1) at 76:15-76:23). The fact that Plaintiff does not have Co-Tenancy calculations to rebut Defendant's allegations does not absolve Defendant of the responsibility to provide evidence demonstrating when the Co-Tenancy Requirement was violated.[10]

Therefore, at this stage of the proceedings, there is no genuine issue of fact as to Plaintiff's violation of the Co-Tenancy requirement from March 30, 2020, through May 8, 2020. As

_____

[10] Plaintiff's reply also states "[i]f the Court accepts Dick's counterclaims asserting a breach of the Lease's Co-Tenancy (Section 1.7), Construction Representations (Section 3.6) or Representations and Warranties (Section 17.16) sections as to its May and June, 2020 rent, Dick's is still in breach of the Rent Deferral Agreement and thus owes full Minimum Rent for April, 2020." (Pl.'s Reply (Doc. 27) at 2 (emphasis added).) This court declines to read this statement as a concession by Plaintiff that, if this court accepts Dick's arguments regarding the Co-Tenancy Requirement, then it must necessarily find that Defendant was entitled to pay Substitute Rent for June 2020.

-34-

a result of that violation, Defendant was presumptively entitled
to pay Substitute Rent for April and May 2020.

However, Plaintiff argues Defendant was not entitled to pay
Substitute Rent in lieu of Minimum Rent for April 2020, (see
Pl.'s Reply (Doc. 27) at 1-5), because the parties had executed
a rent deferral agreement for April 2020 rent, and Defendant
breached that agreement. (See id.) This court must therefore
determine whether the parties entered into a valid contract
regarding April 2020 rent before it can determine the effect of
the Co-Tenancy Requirement violation on April Rent. See infra
Section IV.B.4.

Therefore, this court finds that due to the violation of
the Co-Tenancy Requirement, Defendant was permitted to pay
Substitute Rent for May 2020. This court will grant Defendant's
motion for summary judgment so far as it requests declaratory
judgment that, for May 2020, Defendant was entitled to pay
Substitute Rent in lieu of Minimum Rent.

### 4.  Rent Deferral Agreement

Defendant argues it did not enter into an agreement
regarding April 2020 rent with Plaintiff. (Def.'s Resp.
(Doc. 25) at 18-19.) Specifically, Defendant argues that Pauline
Balogh's counterproposal regarding April 2020 rent was never
accepted by Defendant's employee, Brandon Barnett. (Id. at 18.)

-35-

Defendant also appears to argue that Barnett lacked authority to accept any offer from Plaintiff. (See id.) In the alternative, Defendant argues the purported agreement was made before the parties were aware of the failure of the Co-Tenancy conditions and the agreement did not purport to reach Substitute Rent. (Id. at 19.)

A valid contract requires an agreement based on a meeting of the minds and sufficient consideration. See Creech ex rel. Creech v. Melnik, 147 N.C. App. 471, 477, 556 S.E.2d 587, 591 (2001). Further, to be enforceable, a contract must be sufficiently definite. McClean v. Duke Univ., 376 F. Supp. 3d 585, 606 (M.D.N.C. 2019) (citing Brooks v. Hackney, 329 N.C. 166, 170, 404 S.E.2d 854, 857 (1991)). However, a "contract need not definitely and specifically contain in detail every fact to which the parties are agreeing." Sides v. Tidwell, 216 N.C. 480, 480 5 S.E.2d 316, 318 (1939).

This court finds the alleged agreement between Balogh and Barnett was sufficiently definite. Barnett stated "[Defendant] will pay the April rent at a 25% reduction and pay back starting [January 1, 2021]." (Email Chain (Doc. 23-8) at 2.) There is no genuine dispute that the parties understood "April rent" to mean Minimum Rent of $90,750 and that 75% of April rent would be due immediately, with the remainder due on January 1, 2021. As

-36-

Defendant notes, the parties were not aware of any alleged failure of the Co-Tenancy Requirement when Barnett and Balogh were communicating. (Def.'s Resp. (Doc. 25) at 19.) Thus, the parties believed Defendant would owe Minimum Rent for April, not Substitute Rent and there was no reason for them to discuss Substitute Rent. Additionally, Balogh's April 3, 2020 email refers to "base rent" as $90,750, (Email Chain (Doc. 23-8) at 3-4), and Minimum Rent for the Demised Premises in April was $90,750, (Compl. (Doc. 3) ¶ 11; compare Lease (Doc. 23-1) § 4.1(a)(ii), with Lease (Doc. 23-1) § 6.1), demonstrating that the parties were discussing Minimum Rent. Barnett's April 7, 2020 response to Balogh's email also referenced "base rent" and made no mention of Substitute Rent. (See Email Chain (Doc. 23-8) at 3.) Thus, this court finds that there was a sufficiently definite agreement to reduce April 2020 Minimum Rent by twenty-five percent with the deferred portion to be paid back January 1, 2021.

The next question is whether Barnett accepted this agreement. Acceptance "manifests the offeree's intent to be bound by the terms of the offer. Intention is the key element." Exec. Leasing Assocs. v. Rowland, 30 N.C. App. 590, 592, 227 S.E.2d 642, 644 (1976). A party may communicate its acceptance "by any means sufficient to manifest intent" which "may include

-37-

a signature, silence, or conduct." Id. (citing Albemarle Educ.
Found., Inc. v. Basnight, 4 N.C. App. 652, 167 S.E.2d 486
(1969)).

Defendant contends Barnett never accepted Balogh's
counterproposal. (Def.'s Resp. (Doc. 25) at 18–19.) The record
contradicts this argument. On April 9, 2020, Barnett wrote
Balogh that, "[Defendant] will pay the April rent at a 25%
deduction." (Email Chain (Doc. 23-8) at 2.) He asked Balogh to
"[p]lease confirm," and said he would, "submit [the agreement]
to my team." (Id.) Contrary to Defendant's argument, this did
not condition Barnett's acceptance on subsequent approvals from
Defendant. Instead, it manifested Barnett's intention to bind
Defendant to the rent deferral agreement. Barnett stated
Defendant would pay the agreed upon sum at the agreed upon time.
(See id.) He did not state or imply that acceptance was
conditioned on approval from other members of his team or that
he intended to further negotiate with Balogh. (See id.) Since
this court finds Barnett accepted the agreement, the remaining
question is whether he possessed authority to do so.

Plaintiff contends that Barnett possessed both actual and
apparent authority to bind Defendant to the rent deferral
agreement. (See Pl.'s Reply (Doc. 27) at 4–5). A principal is
liable for a contract made by his agent with a third party if

-38-

(1) "the agent acts within the scope of his actual authority;" (2) the principal ratifies an otherwise unauthorized contract; or (3) "the agent acts within the scope of his apparent authority, unless the third person has notice that the agent is exceeding his actual authority." Morpul Rsch. Corp. v. Westover Hardware, Inc., 263 N.C. 718, 721, 140 S.E.2d 416, 418-19 (1965).

"Actual authority is that authority which the agent reasonably thinks he possesses, conferred either intentionally or by want of ordinary care by the principal. Actual authority may be implied from the words and conduct of the parties and the facts and circumstances attending the transaction in question." Harris v. Ray Johnson Constr. Co., 139 N.C. App. 827, 830, 534 S.E.2d 653, 655 (2000). An agent's authority to bind his principal must be demonstrated by the principal's conduct; "[a]n agent's authority to bind his principal cannot be shown by the agent's acts or declarations." Stainless Valve Co. v. Safefresh Techs., LLC, 231 N.C. App. 286, 289-90, 753 S.E.2d 331, 334 (2013) (quoting Simmons v. Morton, 1 N.C. App 308, 310, 161 S.E.2d 222, 233 (1968)).

By contrast, apparent authority "includes authority to do whatever is usual and necessary to carry into effect the principal power conferred upon the agent and to transact the

-39-

business which he is employed to transact." <u>Morpul Rsch. Corp.</u>, 263 N.C. at 721, 140 S.E.2d at 419. "When a corporate agent acts within the scope of his apparent authority, and the third party has no notice of the limitation on such authority, the corporation will be bound by the acts of the agent." <u>Zimmerman v. Hogg & Allen, Pro. Ass'n</u>, 286 N.C. 24, 30, 209 S.E.2d 795, 799 (1974). Put another way, a principle is liable for contracts his agent enters into with a third party if the "third [party,] in the exercise of reasonable care[,] was justified in believing that the principal had . . . conferred [authority] upon his agent." <u>Bookman v. Britthaven, Inc.</u>, 233 N.C. App. 454, 458, 756 S.E.2d 890, 894 (2014) (quoting <u>Munn v. Haymount Rehab. & Nursing Ctr.</u>, 208 N.C. App. 632, 639, 704 S.E.2d 290, 295 (2010)).

Plaintiff argues that Barnett was clothed with actual and apparent authority to bind Defendant to the agreement with Balogh. (<u>See</u> Pl.'s Reply (Doc. 27) at 4–5.) Plaintiff claims Barnett possessed actual authority based on his title of real estate manager, the "unconditional offer of performance" in his April 9, 2020 email, and because he initiated negotiations with Balogh. (Pl.'s Reply (Doc. 27) at 4–5.) While these facts suggest Barnett possessed actual authority, they do not answer the relevant legal inquiry—whether Barnett reasonably thought he

-40-

had authority to unilaterally enter the agreement on Defendant's
behalf. Balogh's response to a question about internal approvals
at Dick's bolster's this conclusion.

> Q. You don't know how approvals or authority work at
> Dick's Sporting Goods --
> A. That I don't, no.

(Pl.'s Excerpts Balogh Dep. (Doc. 23-6) at 23.) Plaintiff cites
no evidence regarding Barnett's job description or statements
from Defendant to Barnett about what authority he had to
negotiate rent abatement contracts with Defendant's landlords.
While the facts Plaintiff marshals all suggest Barnett believed
he had authority, they are not dispositive on the question of
actual authority at the summary judgment stage.

Plaintiff's claims regarding Barnett's apparent authority
rely on the same facts. (See Pl.'s Reply (Doc. 24) at 4-5.)
Again, Plaintiff fails to show these factors satisfy the test
for apparent authority. To prove apparent authority, Plaintiff
must show that it reasonably believed Barnett possessed
authority to bind Defendant to a contract with Plaintiff. See
Brookman, 233 N.C. App. at 458, 756 S.E.2d at 894.

Relevant to this question is Balogh's impression of
Barnett's authority to enter the agreement. In her deposition,
Balogh said Barnett, "is in charge of real estate, usually . . .
the [real estate] manager is the one that tells his team this is

-41-

what we're going to do, this [has been] my experience with all the real estate I've ever owned." (Pl.'s Excerpts Balogh Dep. (Doc. 23-6) at 23.) This demonstrates that Balogh believed, based on Barnett's title and her own past real estate transactions, that Barnett possessed authority to bind Defendant. While it shows Balogh believed Barnett possessed authority, it does not prove her belief was reasonable. This court was not provided information about whether it is industry practice for real estate managers to possess authority to enter into binding rent deferral agreements or how many real estate managers Balogh made agreements with in the past. Therefore, this court finds that Plaintiff is not entitled to judgment as a matter of law at this stage in the proceedings.

Additionally, it appears Defendant has raised a genuine issue of material fact about whether Barnett possessed authority to enter the agreement. Defendant's response makes two statements about Barnett's authority, "Barnett stated that he would have to submit the proposal to his internal team. He did not express authority to accept on the phone or via e-mail . . . . Barnett did not state [to Balogh] that he accepted, or even that he had authority to do so." (Def.'s Resp. (Doc. 25) at 3, 18.) One interpretation of Defendant's statements is that Barnett lacked the authority to unilaterally enter a rent

-42-

deferral agreement, and therefore did not affirmatively inform Balogh that he possessed authority. Under this interpretation, there is a genuine dispute of material fact about whether Barnett possessed authority.

However, if Defendant argues that Barnett never affirmatively informed Balogh that he possessed authority, but admits that Barnett did have such authority, then there is no genuine issue of material fact. When an agent acts within the scope of their actual authority, they bind the principal regardless of whether they inform the third party that they possess such authority. See Stainless Valve Co., 231 N.C. App. at 289-90, 753 S.E.2d at 334 (noting that the acts of the principal, not the agent, are dispositive in determining whether an agent has authority). Therefore, if Barnett did possess actual authority, Defendant is bound to the agreement with Balogh.

However, as this is a motion for summary judgment, this court is bound to make "rational inferences in the light most favorable to the party opposing that motion." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (citations and internal quotation marks omitted). Taken in the light most favorable to Defendant, the statements in its response brief that Barnett never told Balogh he possessed authority are an

assertion that he lacked the authority to bind Defendant. Therefore, this court will deny Plaintiff's motion for summary judgment insofar as it seeks recognition the rent deferral agreement existed and controls the amount Defendant owed for April Rent.

Since the issue of whether there was a rent deferral agreement in place has not been conclusively established, the proper measure of Defendant's April rent—be it Minimum Rent, Substitute Rent, or rent under the rent deferral agreement—is an issue for trial.

### 5. **Frustration of Purpose**

Defendant also argues it did not breach the Lease because its obligations under the contract were excused under the doctrine of frustration of purpose. (Answer (Doc. 7) at 5.) Defendant contends it entered the Lease to use the "Demised Premises for [its] retail purposes" and that "purpose was frustrated by the events surrounding the COVID-19 pandemic." (Answer (Doc. 7) at 21.) Plaintiff argues frustration of purpose is inapplicable because the subject of the Lease, the Demised Premises, was not destroyed and because the Force Majeure provisions of the Lease "allocated the economic risk to [Defendant]." (Pl.'s Br. (Doc. 24) at 17.) Defendant did not argue the issue further in its response, (see Def.'s Resp. (Doc.

-44-

27)), but sought summary judgment on the issue in its cross-motion, (Def.'s Cross-Mot. for Summ. J. (Doc. 41-1) at 1).

Under North Carolina law, the purpose of a contract is frustrated when "performance remains possible[] but is excused" by "a fortuitous event [that] supervenes to cause a failure of the consideration or a practically total destruction of the expected value of the performance." Brenner v. Little Red Sch. House, Ltd., 302 N.C. 207, 211, 274 S.E.2d 206, 209 (1981) (quoting 17 Am. Jur. 2d Contracts § 401 (1964)). The doctrine's "fundamental premise" is to "giv[e] relief in a situation where the parties could not reasonably have protected themselves by the terms of the contract against contingencies which later arose." Id. (quoting 17 Am. Jur. 2d Contracts § 401 (1964)).

Frustration of purpose is not a defense "[i]f the frustrating event was reasonably foreseeable" or "if the parties have contracted in reference to the allocation of the risk involved in the frustrating event . . . ." Id. Additionally, "[i]n order for the doctrine of frustration of purpose to constitute a defense to the obligation to pay rent under a valid lease, the subject of the contract must be destroyed." Tucker v. Charter Med. Corp., 60 N.C. App. 665, 670-71, 299 S.E.2d 800, 804 (1983) (finding the purpose of a commercial lease was not

-45-

frustrated after the city of Raleigh denied the defendant's request to build a 40,000 square foot building on the property).

This court finds Defendant's reliance on the defense of frustration of purpose unpersuasive. A tenant may only invoke frustration of purpose as a defense when "the subject of the contract . . . [is] destroyed." Id. Here, neither party disputes the validity of the Lease, (compare Def.'s Resp. (Doc. 25) at 9–18 (arguing Defendant did not breach the valid Lease agreement), with Pl.'s Br. (Doc. 24) at 6), or that the Demised Premises was not destroyed, (compare Answer (Doc. 7) at 1–2, 14 (describing the Demised Premises and noting that it reopened to the public on May 8, 2020), with Pl.'s Br. (Doc. 24) at 17). Since this court finds the defense of frustration of purpose is inapplicable to these facts, it does not reach the question of whether the Force Majeure provision allocated the risk to Defendant.[11] Thus, Defendant's cross-motion for summary judgment will be denied insofar as it seeks a "Declaratory Judgment regarding Frustration of Purpose." (Def.'s Cross-Mot. for Summ. J. (Doc. 41-1) at 2.)

---

[11] This finding is consistent with other courts that have held that COVID-19 did not create a valid defense of frustration of purpose. See e.g., Gap Inc. v. Ponte Gadea N.Y. LLC, 524 F. Supp. 3d 224, 235 (S.D.N.Y. 2021).

-46-

C.  **Defendant's Breach of Contract Claim**

Defendant seeks summary judgment on its counterclaim for breach of contract. (Def.'s Cross-Mot. for Summ. J. (Doc. 41-1) at 2). Defendant alleges Plaintiff breached the Lease by: (1) "failing to provide premises suitable for [Defendant's] intended use;" (2) "demand[ing] payments it was not entitled to;" and (3) "fail[ing] to return overpayments under the lease." (Id.)

District courts may deny a motion for summary judgment "where there is reason to believe that the better course would be to proceed to a full trial." Anderson, 477 U.S. at 255; see also Andrew v. Clark, 561 F.3d 261, 271 (4th Cir. 2009) (noting district courts have "discretion . . . to deny summary judgment motions even when the standard appears to have been met"); Forest Hills Early Learning Ctr., Inc. v. Lukhard, 728 F.2d 230, 245 (4th Cir. 1984) ("A court may properly decline, for a variety of reasons, to grant" summary judgment.)

The substance of Defendant's counterclaim first appears in its answer where it recites the three points quoted above without any providing additional context. (See Answer (Doc. 7) at 21-22.) Similarly in its response, Defendant makes the same assertion it is entitled to summary judgment because it "has not breached the Lease[,] . . . it has paid all amounts due under

-47-

the Lease, and in fact has overpaid for amounts not due." (See Def.'s Resp. (Doc. 25) at 4.)

As noted supra Section IV.b.3, this court finds that the Co-Tenancy Requirement was not satisfied and Defendant was entitled to pay Substitute Rent for May 2020. However, Defendant does not argue that the failure of the Co-Tenancy Requirement constituted breach of the Lease. Instead, Defendant notes that its "obligation to pay full Rent [was] conditioned on whether certain co-tenancy conditions are met." (Def.'s Resp. (Doc. 25) at 5 (emphasis added).) If the Co-Tenancy Requirement was met, Minimum Rent was owed. If it was not, Substitute Rent was owed. However, Plaintiff did not breach the Lease in either case.

This court is not persuaded Defendant is entitled to summary judgment on its claim for breach of contract because it has failed to make arguments beyond a bare recitation of these grievances. Without further evidence and argument from the parties on these issues, this court finds "that the better course would be to proceed to a full trial." Anderson, 477 U.S. at 255. Therefore, this court will deny Defendant's motion for breach of contract.

## V.   CONCLUSION

For the reasons stated herein, Plaintiff's motion for summary judgement, (Doc. 23), will be denied, Defendant's motion

-48-

for summary judgment, (Doc. 40-1), will be granted in part and denied in part, and Defendant's motion for supplemental briefing, (Doc. 40), will be denied.

Specifically, this court finds that Sections 3.6 and 17.16 of the Lease are ambiguous on the question of whether Defendant was permitted to abate rent due to closures from COVID-19. The court also finds the Co-Tenancy Requirement was unmet from March 30, 2020, through May 8, 2020, which permitted Defendant to pay Substitute Rent in lieu of Minimum Rent. The court further finds there is a genuine issue of material fact as to whether the parties entered into a binding rent deferral agreement for April rent. Finally, this court finds Defendant's obligations under the Lease were not frustrated by the COVID-19 pandemic.

For the reasons set forth herein,

**IT IS ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 23) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Cross-Motion for Summary Judgment (Doc. 41-1) is **GRANTED IN PART AND DENIED IN PART**, it is **GRANTED** insofar as Defendant was entitled to pay Substitute Rent for May 2020 because the Co-Tenancy Requirement was not met. The remaining elements of the Cross-Motion are **DENIED**.

-49-

**IT IS FURTHER ORDERED** that Defendant's Motion for
Supplemental Briefing, (Doc. 40), is **DENIED**.

This the 30th day of September, 2022.

_____
United States District Judge